William B. TAYLOR, Sr., individually and as Personal Representative (Administrator) of the Estate of William B. Taylor, Jr., and Mattie Taylor, Plaintiffs,

v.

Jerry COLLINS, individually and as a police officer of the City of Flint; Max Durbin, Chief of Police of the City of Flint Police Department, individually and in his official capacity; and the City of Flint, a Municipal Corporation, Defendants.

No. 80–40335.

United States District Court,
E.D. Michigan, S.D.

Nov. 21, 1983.

Thomas Stanley, Pontiac, Mich., for plaintiffs.

Linda Olivieri, Frederick Schmoll, Flint, Mich., for defendants.

## MEMORANDUM OPINION
## AND ORDER

NEWBLATT, District Judge.

I  FACTS

This is a 42 U.S.C. § 1983 action brought by William B. Taylor, Sr., the father and personal representative of the estate of William B. Taylor, Jr. and by Mattie Taylor, the mother of William B. Taylor, Jr.

On July 8, 1980, Flint police officers Gerald Collins and Thomas Peek were notified, by police dispatch radio, of a reported breaking and entering on Basil Lane, in the City of Flint. The two officers arrived at the scene of the alleged breaking and entering and officer Collins sighted a person fleeing on foot from the home that had been reported burglarized. For reasons to be developed hereafter, Collins shot the fleeing suspect fatally.

The dead suspect, who had indeed participated in a burglary of the house on Basil Street, was Billy Taylor, the fifteen-year-old son of the two persons bringing this action. Plaintiffs sued the following remaining defendants: Officer Collins; Chief

of Police Max Durbin; and the City of Flint.

On August 26, 1983, plaintiffs filed a motion for summary judgment. In an opinion read into the record on September 19, 1983, the Court denied this motion on the ground that the motion was not supported by evidence as required by Rule 56 of the Federal Rules of Civil Procedure. On October 20, 1983, plaintiffs filed a motion for summary judgment against the City of Flint only. This motion is supported by evidence in accordance with Rule 56. The City has responded with two opposition briefs. (Docket entries ## 167 and 168.)

Plaintiffs' motion is based solely on a Fourth Amendment theory as that amendment was recently interpreted and applied by the Court of Appeals for the Sixth Circuit in *Garner v. Memphis Police Dept.,* 710 F.2d 240 (CA 6, 1983) decided on June 16 of this year. It should be recalled that this Court briefly commented on *Garner* at the August 16, 1983 hearing in the context of a motion for a continuance filed by all the defendants. As was then pointed out, *Garner* would not seem to be decisive with respect to the racial discrimination equal protection clause claim asserted by plaintiffs. Furthermore, in light of the qualified immunity enjoyed by the individual defendants, *Garner* cannot even be said, as to these defendants, to be of decisive significance as to the Fourth Amendment claims asserted by plaintiffs. In light of this, the Court refused to grant a continuance based on *Garner.*

The October 20, 1983 motion, however, is directed to the City only. And because the City does not enjoy a qualified section 1983 immunity, *Garner* takes on considerable importance. *See Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). The Court has carefully studied *Garner* and the rest of the relevant law. The Court has also studied plaintiffs' brief (at docket entry # 166) and the City's response briefs (at docket entries ## 167, 168.) In this respect, the Court noted that plaintiffs have supported their motion by excerpts from the December 8, 1982 deposition of officer Collins. After reading the excerpts, the Court felt that it was necessary to study the entire Collins deposition. Notice of the taking of this deposition is filed at docket entry # 108. Since Eastern District Local Rule 16(g) eliminated the necessity of filing all depositions, this notice put the deposition into the record and thus was subject to being considered by the Court on this motion for summary judgment. Indeed, even if the deposition had not yet been put into the record, it would have been permissible under Rule 56 for the Court to order the already taken deposition into the record for purposes of deciding the motion. *See* Wright & Miller, *Federal Practice & Procedure* § 2721. In any event, the Court has carefully considered the Collins deposition in its entirety.

A final pretrial conference was held in this case on November 3, 1983. The Court indicated that an opinion would be entered shortly deciding the pending motion for summary judgment. Subsequent to the final pretrial conference, on November 7, 1983, the City filed its supplemental brief along with an affidavit of officer Collins. The Court has considered the November 7, 1983 Collins affidavit along with the Collins deposition.

Having carefully studied the briefs, the evidence and the law, plaintiffs' motion for summary judgment against the City will herein be decided.

## II LEGAL ANALYSIS

■ In analyzing this motion, two threshold procedural issues raised by defendant must be addressed. First, defendant argues that the motion should be denied outright because it was filed later than the September 5, 1983 motion deadline set in the Court's Order of August 18, 1983.

It is true that this motion is beyond the September 5, 1983 deadline date without explanation. Deadlines must be respected; without such respect, courts are unable to regulate their dockets. Nevertheless, it would be unwise policy and counterproductive to deny the motion as a sanction. If plaintiffs have succeeded in removing all

genuine issues of fact as to the liability of defendant City, it is in the Court's best interest to decide and grant the motion and thereby save court time. This possibility is enough to justify the Court proceeding to decide the motion. Also, the Court notes that defendant City has had and has taken advantage of the opportunity to file two briefs in opposition to plaintiffs' motion. (*See* briefs at docket entries ## 167, 168.)

But the Court cannot allow plaintiffs to go unpunished. Consequently, as a sanction for the tardy motion, the Court hereby ORDERS plaintiffs to pay a fine of $250 to the Clerk of the Court as a sanction. The fine must be paid within five (5) days from the date of this Order.

■ A second threshold procedural issue involves the affidavit of attorney Waterman (filed at docket entry # 166). As defendants point out, this affidavit does not comply with the Rule 56(e) personal knowledge requirement. Therefore, the affidavit will not be considered by the Court in deciding this motion.

■ Having considered the threshold procedural issues, two threshold substantive issues must be addressed. The first of these is the issue of qualified immunity. And the rule of law is clear. A municipality is not entitled to assert the defense of qualified immunity in section 1983 actions. *See Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). The City, of course, has not asserted this defense, but the Court feels that it is necessary to briefly mention *Owen* in order to explain why the City cannot assert the qualified immunity defense even though the defense is available to the individual defendants in this case.

■ The other threshold substantive issue is that of retroactivity. Defendant contends that the recent Sixth Circuit *Garner* decision should not be applied to this case which arose out of events that occurred over three years before *Garner*.

At the outset, note must be taken of the anomalous nature of defendant's request. In *Garner*, the Sixth Circuit held that the Tennessee fleeing-felon statute was unconstitutional as applied to a case arising in 1974. Clearly, the Sixth Circuit *Garner* court applied its ruling retroactively. Thus, this trial court is now being asked to render a non-retroactive *Garner* ruling where the appellate court applied *Garner* retroactively.

Nevertheless, it must be acknowledged that the *Garner* opinion said nothing about the retroactivity issue, and the possibility must readily be acknowledged that the retroactivity issue simply may not have been considered. Therefore, a retroactivity analysis must be undertaken.

In *Chevron Oil v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the Supreme Court set out a three-pronged test to be applied in deciding whether a newly-enunciated rule should be applied retroactively. The first prong of this test is whether the new rule overrules clear precedent or decides an issue of first impression the resolution of which was not clearly foreshadowed.

The City vigorously argues that *Garner* indeed resolved an issue of first impression that was not clearly foreshadowed. This argument turns on the fact that *Garner* was the first Sixth Circuit decision to squarely hold that a fleeing-felon statute violated the Fourth Amendment. While superficially persuasive, this argument cannot survive close scrutiny.

Billy Taylor was killed on July 8, 1980. On June 18, 1979, the Sixth Circuit decided the *first* appeal in the *Garner* case. *See Garner v. Memphis Police Dept.,* 600 F.2d 52 (CA 6, 1979), hereafter referred to as *Garner I*. The precise ground for reversal in *Garner I* was that the district judge had—in a pre *Monell** ruling—erroneously held that the City of Memphis was not a "person" under 42 U.S.C. § 1983. Nevertheless, this Court notes that the 1979 *Garner* opinion contains nearly a whole page discussing the issues to be decided on remand by the trial judge. These issues are enumerated at 600 F.2d 54, 55. One of the enumerated issues was whether a munici-

---

* *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

pality's use of a state fleeing-felon statute to justify a fleeing-felon regulation was constitutional under the Fourth Amendment. *See* 600 F.2d 55. A footnote—footnote 2—to this issue lists seven cases and two law review pieces. *See* 600 F.2d 55 n. 2 (1979).

Two of the cases in footnote 2 are *Mattis v. Schnarr,* 547 F.2d 1007 (CA 8, 1976) and *Jones v. Marshall,* 528 F.2d 132 (CA 2, 1975). These cases contain scholarly and conceptual discussions justifying rulings that strike down fleeing-felon statutes on bases other than the Fourth Amendment. Nevertheless, both *Mattis* and *Jones* are cited and quoted extensively in *Garner II. See Garner v. Memphis Police Dept.,* 710 F.2d at 244–45. Clearly, the concepts discussed in *Mattis* and *Jones* were very influential in *Garner II.*

Furthermore, footnote 2 of the 1979 *Garner* opinion cites the following law review comments: *Comment, Deadly Force to Arrest: Triggering Constitutional Review,* 11 Harvard Civil Rights and Civil Liberties Review 361, 364–65 (1976). This Comment, cited at page 244 of the 1983 *Garner* decision, was extremely important in the analysis of the *Garner II* opinion. The Comment contains an incisive and richly detailed discussion of the historical background of the English common law rule allowing the shooting of fleeing felons. The Comment foretold the line of analysis at pages 244–45 of the *Garner II* opinion. In other words, a careful examination of the Comment reveals that the historical foundation of American state fleeing-felon statutes is a foundation built on loose sand.

In sum, the *Garner II* Fourth Amendment ruling—set out on pages 243–46—was no shock. City attorneys in Michigan, Tennessee, Ohio, and Kentucky should have read the cases cited at 600 F.2d 52, 55 fn 2. If they had done so, within a few months of June 18, 1979, fleeing-felon police department policies would have been altered to forbid shooting at fleeing unarmed burglars. But Billy Taylor was killed twelve months *after Garner I* and—at the time of the boy's death—the Flint police department had a regulation which allowed police officers to shoot fleeing un-

armed and non-dangerous burglars where the escape would result in the crime going unpunished. In light of *Garner I,* the Court rejects the City's theory that the *Garner II* Fourth Amendment ruling was not clearly foreshadowed.

The second *Chevron* inquiry is whether retrospective operation of *Garner* would further or retard the new rule's operation. The Court believes that this prong of the test has a neutral effect in this case. Whether or not the *Garner* rule is applied retroactively, the *Garner* decision clearly will have a prodigious effect on police practices.

Finally, the Court weighs the issue of whether retroactive application will produce a substantially inequitable result. In arguing this issue, the City tells the Court that:

"It would indeed do an injustice to the taxpayers of the City of Flint to require those taxpayers to pay for plaintiffs' damages and suffer the concomitant decrease in City services simply because the City could not anticipate that state law might, in the future, be considered unconstitutional." (*See* brief at docket entry # 169, p 8.)

This statement is far too sweeping. As to the second part of the statement, the Court already has established why it was unreasonable for the City not to be ready for *Garner II.* It could, and it should have anticipated *Garner II.* It had a responsibility to its citizens and to the Taylors to have anticipated a ruling so clearly forthcoming. Furthermore, the Court notes that the City is not liable for punitive damages under 42 U.S.C. § 1983. *See Newport v. Fact Concerts,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Thus, there is no reason to conclude that a judgment in this case would cause a staggering decrease in city services. This is simply an inflammatory statement not supported in any way. Moreover, in weighing the equities, it is noted that—unlike the *Chevron* plaintiff—the instant plaintiffs did not sleep on their rights. Instead, they promptly filed suit under the Civil Rights

Act. Plaintiffs claim to have suffered a dreadful emotional loss and it simply is not inequitable for the taxpayers to pay out compensatory damages if such claim is legally established.

The Court thus concludes that retroactive application of *Garner* is appropriate. The Court will now move on to consider the core substantive issues raised by the motion for summary judgment.

■ The City cannot be held liable under section 1983 unless a city policy, custom, regulation or usage caused the constitutional tort. *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Where a City policy authorizes a constitutionally tortious act and where that act is committed by a state actor, (an agent or employee of the state or its subdivisions and acting as such) the *Monell* causation condition is satisfied. *See Hays v. Jefferson County*, 668 F.2d 869, 875 (CA 6, 1982); *Van Ooteghem v. Gray*, 628 F.2d 488 (CA 5, 1980).

■ Thus, if the police department had an unconstitutional regulation, and if Gerald Collins shot Billy Taylor in a context authorized by the unconstitutional regulation, the City caused the boy's death under 42 U.S.C. § 1983. This, of course, assumes the entirely settled rule that a police department's policies can be said to be the policies of the City in which the police department is located. *See* the cases just cited. In other words, the Memphis police regulations are—for section 1983 purposes—the regulations of the City of Memphis. And the Flint Police Department regulations are—for section 1983 purposes—the regulations of the City of Flint.

■ The Court now considers whether the fleeing-felon regulation of the Flint Police Department was violative of the Fourth Amendment. This regulation is Exhibit B to the summary judgment motion at docket entry #166. The regulation provides in pertinent part:

"Deadly force may be used to effect an arrest only in extreme situations in order to protect officers or innocent citizens from bodily harm, or in order to prevent the escape of the perpetrator of a serious felony such as murder, rape, robbery, burglary, arson and then only if it is likely that the escape would result in the crime going unpunished. With the exception of offenses involving the danger of great bodily harm or death, under no circumstances shall deadly force be used to effect the arrest of a fleeing offender known to the officer to be a juvenile."

It thus can be seen—and the Court hereby recognizes—that the Flint Police Department regulation permits the shooting of a fleeing non-juvenile felon who is escaping from a burglary where the burglar would go unapprehended absent the shooting. The Court now considers whether this squares with the *Garner* holding.

The *Garner* holding is stated at page 246:

"The officers may be justified in using deadly force if the suspect has committed a violent crime or if they have probable cause to believe that he is armed or that he will endanger the physical safety of others if he is not captured."

But the Flint regulation permits the shooting of a nonjuvenile who merely is fleeing from a burglary and who cannot otherwise be apprehended. Such a fleeing burglar is not the committer of a violent crime. Furthermore, under the regulation, the police need not establish probable cause to believe that the fleeing burglar is armed or that he will endanger the safety of others. Therefore, the Flint regulation is overbroad and in the situation discussed above, is violative of the Fourth Amendment. If the Billy Taylor shooting falls within this situation, the City caused the constitutionally tortious death of the boy. And if there is no genuine issue of fact as to whether the Billy Taylor shooting falls therein, this Court is *obligated* under Rule 56 to grant plaintiffs' summary judgment motion against the City.

■ Let us move on to consider whether there is a genuine issue of fact as to whether Billy Taylor committed a violent crime *or* whether officer Collins had probable cause to believe Billy Taylor was armed *or* a danger to the physical safety of others.

If a genuine issue of fact exists as to any of these disjunctives, the summary judgment motion will be denied.

In this inquiry, the Court first considers the issue of whether Collins had probable cause to believe Taylor had committed a violent crime. The record contains a number of items of evidence that strongly argue that no such probable cause existed.

In this respect it is first noted that in a proposed final pretrial statement, filed and signed by the City's attorney at docket entry # 152, it is stipulated that

"William Taylor, Jr. had participated in a breaking and entering of an unoccupied dwelling at 1929 Basil Lane just before he was shot." *See* ¶ C of list of uncontested facts at page 5 of docket entry # 157.

Furthermore, in his deposition, officer Collins said utterly nothing about believing that a violent crime had occurred. Collins testified that upon leaving his police cruiser, he went into the back yard of the burglarized house. There, he noticed drawers laying on the ground, a slightly opened back door, a bathroom window that was open and a waving curtain. (*See* Collins deposition at page 27.) Seconds later Collins saw the fleeing silhouette of Billy Taylor.

Finally, in response to the question of why it was necessary to shoot Taylor, Collins testified as follows:

"I fired at the silhouette because there was no way I was going to ever be able to identify that person. There was no way I was ever going to be able to catch that person. And he was flat out going to get away."

Belatedly, however, on the eve of this opinion, and having been informed that it was coming, and that *Garner* was important if not controlling, the City has filed an affidavit of officer Collins stating that

"he was extremely concerned that a personal injury crime in addition to the breaking and entering was being perpetrated."

A cynic might believe that this affidavit is but a shabby last minute attempt to twist Collins' testimony such that the shooting incident is made to appear lawful even under *Garner*. Since it would be a waste to spend time analyzing the motives and ethics of the City, the Court will confine its examination to the merits of the question of whether the November 7, 1983 affidavit raises a genuine issue of fact as to whether Collins had probable cause to believe Billy Taylor had committed a violent crime.

The Collins affidavit lists three facts in support of Collins' belief that a personal injury crime may well have occurred. First, Collins was aware from the dispatch that four males had been observed breaking and entering. Collins believed, on the basis of his experience that this was unusual. Second, it was clear to Collins, on the basis of "observations" that people were living in the burglarized house. Third, when Collins reentered the front yard of 1927 Basil Lane in pursuit of Taylor, he became "immediately concerned" about the safety of his partner, officer Peek. The concern stemmed from the fact that Collins did not see Peek in the front yard.

The fact that four people committed the breaking and entering does not really relate to the issue of violence. The four burglars could all have acted together in order to obtain as many items as possible from the burglarized house in the shortest possible time. Thus, the report that four persons had committed the burglary does little or nothing to establish that Collins had probable cause to believe a violent crime had or was being committed.

Similarly, Collins' observation that people were living in the house is of little value in establishing probable cause to believe that a violent crime had been committed. At the risk of being flippant in a very serious discussion, this Court must remind the City that burglars—like the rest of us—do not labor for no reward. The *Taylor* burglar—like the *Garner* burglar—entered the burglarized house for the purpose of stealing property. If people did not live in the burglarized house, what could have been the source of the goods that the burglars sought to steal? Clearly, the mere fact

that people lived in the house does nothing to show that a violent crime occurred in the house.

And finally, the Court considers Collins' "concern" about the safety of his partner, officer Peek. At page 29 of his deposition, Collins testified that when he ran into the back yard of the burglarized house, he did not notice where officer Peek was. Collins was then asked (at page 29 of his deposition) the following question about officer Peek:

"Weren't you wondering where he was?" Collins answered as follows:

"No, sir. My whole idea was to get to the backyard to cover the back."

Collins now apparently alleges that in the moments between the time he was in the backyard and the time he ran to the front yard of the burglarized house, he became immediately concerned about Peek's safety. Taking this as true, the Court cannot understand why Collins testified at his deposition that he believed he was not in a life threatening situation when he shot at Billy Taylor. (See pages 83 and 84 of his deposition.)

Nevertheless, assuming Collins really was concerned about Peek (as it must be assumed for purposes of this motion), the Court does not believe he had even a modest basis to believe Peek had been the victim of a violent crime. In the recent case of *U.S. v. McManus*, 719 F.2d 1395 (CA 6, 1983), the Sixth Court clearly indicated that probable cause is more than a mere possibility. The *McManus* court declared that

"Probable cause exists where the facts and circumstances within the officer's knowledge of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been committed."

The Court holds that the Collins affidavit does nothing more than show that there was a bare possibility that a violent crime had been committed and that Collins had a concern. But this affidavit comes nowhere near establishing probable cause. Indeed, the Court must conclude that the affidavit does not raise a genuine issue of fact as to the existence of probable cause to think that a violent crime had been committed at the scene of the burglary. In other words, Collins' deposition itself removes all genuine issues of fact as to whether such probable cause existed and the Collins' affidavit does not succeed in reviving such factual issues. Thus, the City cannot defeat this motion on the basis of the theory that factual issues remain as to whether Collins had probable cause to believe a violent crime had occurred at the burglarized house; alertness and concern for what is possible is simply not "probable cause."

The Court next considers the issue of whether Collins had probable cause to believe Taylor was armed. Again, the Court considers the Collins deposition. At page 67, Collins is asked whether the silhouette of the fleeing Billy Taylor threatened Collins. Collins answered the question in the affirmative. The next question on page 67 is:

"Did it (the silhouette) appear to have a weapon?" Collins' answer was:

"I couldn't say."

At the bottom of page 67 of the Collins deposition, in response to a question of why Collins felt threatened by the silhouette, Collins testified as follows:

"I didn't know anything about it."

Finally, at page 67 of the deposition, as earlier noted, the following is recorded:

Q: "Can you tell me why you felt it was necessary to fire your gun at the fleeing silhouette or suspect?"

A: "I fired at the silhouette because there was no way I was ever going to be able to identify that person. There was no way I was ever going to be able to catch that person. And he was flat out going to get away."

The issue in focus is whether there is a genuine issue of fact as to whether Collins had probable cause to believe that Billy Taylor was armed. By probable cause, the Court means reasonable trustworthy information from which Collins could infer that Taylor was armed. But the Collins' deposi-

tion indicates that Collins *himself* didn't even believe for certain that Taylor was armed and knew of no facts from which it would be affirmatively inferred that Taylor was armed. Indeed, the Court hearkens to its analysis of whether a genuine issue of fact exists as to Collins' probable cause for believing a violent crime had occurred. The issue of whether Billy Taylor, as *one* of the four burglars, was armed is even narrower and thus the probable cause showing would have to be stronger.

But the Court comes away from a reading of Collins' sworn testimony with a firm conviction that Collins shot Taylor merely to prevent him from escaping and that there was no foundation whatsoever, in *fact*, for the belief that Taylor was armed. And the Collins' affidavit does nothing to alter this conclusion. Thus, the Court finds that there is no genuine issue of fact but that Collins *did not* have probable cause to believe Taylor was armed. And so the Court now considers the third *Garner II* safe harbor: the issue of whether Collins had probable cause to believe that Taylor was a danger to the physical safety of others if not captured.

Again, the Court hearkens to pages 67–69 of the Collins' deposition where he testified that he shot Taylor to prevent escape. This is far from an assertion that Taylor had to be halted because he was a physical danger to others. In light of the *Garner II* result, this Court must read the "physical danger to others" requirement as meaning that the officer must have probable cause to believe that the fleeing person is a threat to actually harm the person of others. The deposition clearly indicates that Collins had no basis to believe this. The Court already has concluded that the Collins' affidavit does not raise a genuine issue of fact as to a violent crime being committed at the house. The Court also concludes that the affidavit does not raise a genuine issue of fact as to whether Taylor was a physical danger to others. Indeed, the affidavit simply does not cite to particularized evidence that the burglar was dangerous to the physical safety of others. Thus, the Court must conclude that there is no genuine issue of fact as to the physical danger to others issue. In other words, the conclusion that is compelled is that plaintiffs have shown, beyond a genuine issue of fact, that Collins did not have probable cause to believe that Taylor was a physical danger to others.

The Court has now explored and resolved the following substantive issues: (1) the June 16, 1983 *Garner* decision is retroactive; (2) the City enjoys no qualified immunity as a defense against its section 1983 constitutional torts; (3) the police department's regulations are, in the context of section 1983, the City regulations; (4) the Police Department regulations authorize a police officer to shoot at a fleeing non-juvenile felon if the shooting is necessary to apprehend the fleeing felon even where the police officer has no probable cause to believe (a) the suspect is armed or dangerous to the physical safety of others or (b) has committed a violent crime; (5) there is no genuine issue of fact as to the conclusion that Collins did not have probable cause to believe that Taylor committed a violent crime; (6) there is no genuine issue of fact as to the conclusion that officer Collins did not have probable cause to believe Taylor was armed; (7) there is no genuine issue of fact as to the conclusion that officer Collins did not have probable cause to believe that Taylor was a physical danger to others. Under the *Garner* case, therefore, the Court must conclude that there is no genuine issue of fact remaining as to the conclusion that the City violated Billy Taylor's Fourth Amendment rights through the July 8, 1980 shooting of Taylor by officer Collins. Therefore, the Court is obligated to grant plaintiffs' motion for summary judgment against the City.

And there now is a partial federal court resolution of the constitutionality of the Billy Taylor slaying. This ruling is the ineluctable result of a chain of legal reasoning with *Garner II* defeating the City at every point. The law was clear—and the Court is obligated to faithfully apply the law.

The only possible way out for the City was the retroactivity theory, and this theo-

ry was doomed by the presence of *Garner I. Garner I* was authored by Judge Gilbert Merritt—the same judge who authored *Garner II. Garner I* was the golden trumpet calling out the end of traditional fleeing-felon statutes in the Sixth Circuit. But the City failed to hear Judge Merritt, and thus the City sowed the wind. Today the City reaps the whirlwind. Plaintiff's motion for summary judgment against the City on the issue of liability is hereby GRANTED.

## III  CONCLUSION AND ORDER

For the reasons stated in the foregoing opinion, the Court hereby GRANTS plaintiff's partial summary judgment motion against the City. Therefore, the City is liable to plaintiffs. The Court will notify counsel as to the date of a settlement conference at which time the Court will indicate the trial procedure in the remaining issues in this case.

IT IS SO ORDERED.